STEPHEN C. MCKENNA
(*Pro Hac Vice Application pending*)
mckennas@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>- against -<br><br>SEAWORLD ENTERTAINMENT, INC., and JAMES ATCHISON,<br><br>Defendants. | 1:18-cv-_____-_____<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**ECF CASE** |

Plaintiff, United States Securities and Exchange Commission (the "SEC"), for its

Complaint against defendants SeaWorld Entertainment, Inc. ("SeaWorld") and James Atchison

("Atchison") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.     This Complaint concerns SeaWorld's and SeaWorld's former chief executive

officer ("CEO") Atchison's omissions and disclosures relating to the impact of the documentary

film *Blackfish* on the company's reputation and/or business (*i.e.*, "*Blackfish* effect"). *Blackfish*

was highly critical of SeaWorld's treatment of its orcas (killer whales). The film was released in

theaters in July 2013, and received significant media attention that escalated as the film became

more widely distributed—including via multiple airings on cable television beginning in late October 2013.

2.      Between approximately December 20, 2013, and August 13, 2014 (the "Relevant Period"), in connection with the offer and sale of SeaWorld securities, SeaWorld and Atchison engaged in a course of business that—by failing to disclose the *Blackfish* effect to investors— they should have known would operate as a fraud or deceit upon the purchasers of SeaWorld stock.

3.      SeaWorld and Atchison should have known by December 20, 2013, that *Blackfish* was having a negative effect on the company's reputation and/or business relationships, and, as the Relevant Period progressed, should have known that the *Blackfish* effect was becoming more pronounced.  Yet the Defendants:

a.   Made untrue or misleading statements or omissions to the press about material facts relating to the *Blackfish* effect in late 2013 and early 2014;

b.   Did not disclose the *Blackfish* effect in Form S-1 registration statements filed with the SEC on or around March 24, 2014, and April 2, 2014, relating to a secondary offering of SeaWorld shares by its largest shareholder on April 9, 2014; and

c.   Made untrue or misleading statements or omissions about material facts relating to the *Blackfish* effect during the Relevant Period in periodic filings with the SEC, in public statements including earnings releases and calls, and in communications with underwriters for the April 9, 2014 secondary offering.

4.      During the same Relevant Period, Atchison also obtained money by means of statements that he should have known were untrue statements of material fact and/or contained

omissions of material facts that were necessary in order to make the statements he made not misleading.  From January through March 2014, Atchison sold SeaWorld stock pursuant to a Rule 10b5-1 trading plan he had entered into prior to the Relevant Period.  SeaWorld's stock price was inflated as a result of the conduct alleged in this Complaint, allowing Atchison to avoid losses of approximately $730,860 on his sales.

5.      On August 13, 2014, SeaWorld filed a Form 8-K that, for the first time, acknowledged that its declining attendance was, among other factors, partially caused by negative publicity connected to *Blackfish*.  Following the filing of the Form 8-K, SeaWorld's stock price fell approximately 33% and SeaWorld's stock was significantly downgraded by analysts, causing a loss of approximately $830 million in shareholder value.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

6.      The SEC seeks permanent injunctions against both Defendants enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, against Atchison; and civil penalties pursuant to Section 20(d) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78u(d)(3)] against both Defendants.  The SEC seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were affected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.  SeaWorld's stock is traded on the New York Stock Exchange ("NYSE"), which is located in the Southern District of New York.  In addition, SeaWorld's largest shareholder during the Relevant Period had its principal executive office in New York, New York, where certain activities of SeaWorld's board of directors ("BOD") were conducted.

## DEFENDANTS

9.      **SeaWorld Entertainment, Inc.**:  SeaWorld is a Delaware corporation with its principal place of business in Orlando, Florida.  It is an amusement park company that, during the Relevant Period, operated 11 parks across the United States, including three marine animal parks located in San Diego, Orlando, and San Antonio (the "SeaWorld-named parks") that have historically featured live orca performances under the Shamu trademark.  SeaWorld has been an SEC-reporting company since April 2013, and its shares are listed on the NYSE (ticker symbol: SEAS).

10.     **James Atchison**:  Atchison is a resident of Windermere, Florida.  During the Relevant Period, Atchison was SeaWorld's president and CEO, and also served on SeaWorld's board of directors.  In this role, Atchison exercised control over the management, general operations, and policies of SeaWorld, as well as the specific activities upon which SeaWorld's violations (as set forth herein) are based.

## FACTS

### The Defendants Should Have Known
### that the *Blackfish* Effect Was Material to Investors

11.     Even before *Blackfish* was released in theatres in July 2013, SeaWorld's top management was concerned about the film's potential impact to SeaWorld's business.  Some investors also expressed concern about the film's potential impact to SeaWorld's business prior to the film's release.

12.     In August 2013, soon after *Blackfish*'s theatrical release, SeaWorld reported that attendance in the second quarter dropped from the prior year.  At that time, the Company had not done a specific assessment of whether a portion of that drop was related to *Blackfish*.  The financial press inquired whether *Blackfish* was harming attendance.  In response, SeaWorld told the press that it could "attribute no attendance impact at all to the movie."

13.     On August 28, 2013, an article in the financial press suggested that, despite SeaWorld's denial, there might have been a link between *Blackfish* and SeaWorld's declining attendance.  Immediately following the article, SeaWorld's share price dropped by five percent (5%).  The Defendants should have known that the *Blackfish* effect, if and when such occurred, would be material to investors.

**In Fall 2013, SeaWorld Measured Harm to Its Reputation**

14.     Prior to and throughout the Relevant Period, SeaWorld regularly described its reputation in SEC filings as one of its "most important assets," and linked public perception of the company to the possibility of reduced attendance and a negative impact on the company's business and results of operations.

15.     In September 2013, SeaWorld received the results of its annual corporate reputation study, which was conducted from August 22–30, 2013.  The results, in Atchison's own words, were "painful"—SeaWorld's reputation score had fallen by 12.8% on a year-over-year basis and was the lowest score SeaWorld had measured since beginning the annual study in 2010.

16.     The study also showed that, among those who were aware of *Blackfish*, 32% had less favorable opinions of SeaWorld as a result (vs. 11% who had more favorable opinions), and that even some people who had not heard of *Blackfish* by name were aware of the film's anti-captivity message and might be impacted by it.

17.     The corporate reputation study was presented by the communications department staff to SeaWorld's strategy committee, which included Atchison, on October 17, 2013. Following the study, some SeaWorld officers and employees, including members of the communications department that oversaw the study, believed that *Blackfish* had harmed SeaWorld's reputation.

18.     The next week, SeaWorld's management held a special, day-long meeting to address the significant issues affecting SeaWorld's reputation at the time.  Prior to the special meeting, SeaWorld's communications department determined to exclude the results of the

corporate reputation study from the materials presented at the meeting.  As a result, SeaWorld's then chairman of the board never saw the study and was not aware of its results.

**In Late 2013, the *Blackfish* Effect Was Becoming More Pronounced**

19.     In late November and early December 2013, following the first television broadcasts of *Blackfish*, a number of high-profile musical acts cancelled their performances at SeaWorld and tied the cancellations to *Blackfish*.  As a senior officer in SeaWorld's communications department put it in an email, SeaWorld's reputation at that point was "positively radioactive."

20.     By mid-December 2013, SeaWorld had also been informed that a number of nationally known promotional partners wished to withdraw from or delay marketing arrangements due to their fear of a public backlash associated with *Blackfish*.  Even SeaWorld's "longest running Partner (25 years)" declined to participate in SeaWorld's 50th anniversary tour because of *Blackfish*.

21.     In a December 16, 2013 email, Atchison expressed concern about "the recent band cancellations and momentum building around [SeaWorld's] killer whale program."  He linked the building momentum to "the larger distribution [of] *Blackfish*" and added that he suspected "this trend will not diminish anytime soon, as the film will likely gain an Oscar nomination when they are announced in mid-January."  Although SeaWorld at that time was experiencing year-over-year revenue growth and only modest declines in attendance, these cancellations should have provided confirmation that SeaWorld's reputation had been materially damaged by *Blackfish*, and that the *Blackfish* effect was negatively affecting SeaWorld's business relationships.

22.     In an article published on December 20, 2013, Atchison, while discussing the company's financial performance, provided a quote stating: "As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."  In light of the reputational damage SeaWorld had measured and the ensuing fallout with sponsors and bands that was linked to *Blackfish*, Atchison should have known that his statement was untrue, and/or that his statement contained omissions of material facts that were necessary in order to make the statement not misleading.

23.     In addition, in an article published on January 13, 2014, SeaWorld, with Atchison's knowledge and/or approval, provided a quote stating: "[T]here is no truth to the suggestion that SeaWorld's reputation or business has been harmed by *Blackfish*."  In light of the reputational damage SeaWorld had measured and ensuing fallout with sponsors and bands that was linked to *Blackfish*, SeaWorld should have known that this statement was untrue and/or that it contained omissions of material facts that were necessary to make the statement not misleading.

**By the Time SeaWorld Announced its Q4 2013 Earnings,**
***Blackfish* Was Impacting Attendance**

24.     By approximately January 2014, SeaWorld Orlando staff had begun tallying costs and attendance losses related to group events and promotions that were canceled due to *Blackfish*.  The company also began asking questions in bi-weekly consumer surveys to determine *Blackfish*'s impact on consumers' interest in visiting its parks.

25.     In the first bi-weekly survey, conducted on or about January 16, 2014, the number of respondents who were aware of the *Blackfish* film who were less likely to visit a "marine life park" exceeded those who were more likely to visit by a ratio of 2-to-1 (of the 20% of consumers

8

who were aware of Blackfish, 28.1% said they were less likely to visit, while 14.6% said they
were more likely to visit).

26.     Atchison noted in an email that the actual negative impact might be higher than
that reflected in the first bi-weekly survey because *Blackfish* coverage was amplified in
SeaWorld's home markets, while the surveys were conducted nationally.

27.     Atchison was correct.  Awareness of *Blackfish* at the time was significantly
greater in the San Diego/Los Angeles area (35%), and among those aware of the film the ratio
between those who were less likely to visit, versus those who were more likely, was 46% to
11%.

28.     Around the same time, SeaWorld became aware of two (2) third-party surveys
that yielded similar results to SeaWorld's own bi-weekly survey.  In every survey—whether
conducted by SeaWorld or a third-party—respondents who were aware of the film indicated that
they were less likely to visit SeaWorld or another marine life park as a result of *Blackfish*.

29.     By approximately February 10, 2014, Atchison knew that Q1 2014 attendance to
date had declined both on a year-over-year basis and when compared to SeaWorld's internal
projections.

30.     In early February, SeaWorld park officials reported to Atchison that *Blackfish* was
among the factors negatively impacting attendance at both SeaWorld Orlando ("SWO") and
Busch Gardens Tampa ("BGT").  SWO and BGT were, during the Relevant Period, SeaWorld's
two largest parks in terms of attendance.

31.     Corporate Marketing Staff also reported to Atchison that the three "worst things
we're seeing right now" impacting SeaWorld's 2014 performance outlook  were related to

*Blackfish*: (1) *Blackfish* was impacting the public's perception of SeaWorld; (2) booking

performers had become challenging for SeaWorld parks; and (3) SeaWorld had to postpone its

50th anniversary marketing tour.

     32.     On February 20, 2014, SWO and BGT requested—and Atchison approved—a

special promotional offer intended to offset attendance losses attributed in part to *Blackfish*.

     33.     Notwithstanding the events and data discussed above, on an earnings call on

March 13, 2014, when discussing *Blackfish* and the band cancellations, Atchison stated:

     a.    "With respect to the impact on our business, I get asked that a lot, too. And as much as we're asked it, we can see no noticeable impact on our business . . . we have seen no impact on the business"; and

     b.    "With respect to national surveys and data that we collect around our reputation efforts and image, there's awareness of the movie that kind of peaks and drops . . . . But our surveys don't reflect any shift in sentiment about intent to visit our parks."

     34.     At the time these statements were made, the Defendants should have known that

the statements were untrue and/or that the statements contained omissions of material fact that

were necessary in order to make the statements not misleading.

     35.     Despite the indicators described above that reflected that SeaWorld had suffered

reputational harm due to *Blackfish* and that the reputational harm was negatively impacting

SeaWorld's business, on March 24, 2014, SeaWorld filed a Form S-1 registration statement with

the SEC, signed by Atchison, in which it stated:

***Our brands and our reputation are among our most important assets***. Our ability to attract and retain customers depends, in part, upon the external perceptions of the Company, the quality of our theme parks and services and our corporate and management integrity. . . . An accident or an injury at any of our theme parks . . . that receives media attention, is the topic of a book, film, documentary or is otherwise the subject of public discussions, ***may harm our brands or reputation***, cause a loss of consumer confidence in the Company,

*reduce attendance at our theme parks and negatively impact our results of operations*.

36.    By couching the reputation and business impacts as hypothetical events that "may" occur, the Defendants made untrue or misleading statements.  The Defendants should have known that SeaWorld's reputation had suffered from *Blackfish*; should have known that the reputational damage was negatively affecting SeaWorld's business and attendance; and should have known that these impacts were material to investors.  The Defendants made similar untrue or misleading statements in a Form S-1/A filed on April 2, 2014, and in SeaWorld's FY 2013 Form 10-K filed on March 21, 2014.

37.    Securities Act Regulation S-K, Item 303(a)(3)(ii) ("SK-303") requires issuers, such as SeaWorld, to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues from continuing operations."  Despite the above events indicating that *Blackfish* either was affecting or would affect SeaWorld's financial performance, SeaWorld never conducted an evaluation of *Blackfish*'s potential impact on SeaWorld's operational results, or made any disclosure regarding the known trends or uncertainties associated with *Blackfish* under SK-303 in connection with the filing of its FY 2013 Form 10-K on March 21, 2014, or its Q1 2014 Form 10-Q on May 15, 2014.

### By the Time SeaWorld Announced its Q1 2014 Earnings, *Blackfish* Was a Significant Cause of Declining Attendance

38.    In early March 2014, a bill to ban orca performances was introduced in the California legislature.  The legislation—referred to in the press as the "*Blackfish* bill"—was yet another reaction to the *Blackfish* documentary and created further bad publicity for SeaWorld.

11

39.     At the close of Q1 2014, overall attendance at SeaWorld's parks declined approximately 13% on a year-over-year basis.  By this point in time, SeaWorld should have known that *Blackfish* was a cause of the declining attendance at SeaWorld's parks.

40.     All three SeaWorld-named parks and BGT (which together generated approximately 75% of SeaWorld's 2013 revenues) had identified, in materials prepared for the Q1 2014 BOD meeting, that *Blackfish* was one of the causes of the disappointing Q1 2014 attendance.

41.     SWSD was particularly impacted by *Blackfish* because approximately 75% of SWSD attendance came from local visitors—the same group that surveys showed was most aware of *Blackfish* and most likely to be deterred from visiting a "marine life park" like SeaWorld as a result.

42.     In light of the declining attendance, the survey results, the California legislation, and further internal analysis indicating that—other than at SeaWorld—amusement park business in Southern California was booming, a senior official of SWSD told a senior corporate officer of SeaWorld on April 21, 2014 that "[t]he situation is grave."

43.     By the time SeaWorld announced its Q1 2014 results in mid-May 2014, there was additional evidence that *Blackfish*, particularly its impact at SWSD, was a significant contributing factor to SeaWorld's year-over-year decline in attendance.

44.     In particular, although poor weather and a shift in the Easter holiday/spring break also negatively impacted attendance companywide in Q1 2014, SeaWorld's internal attendance variance charts showed that attendance declines at SWSD could not wholly be attributed to these factors.  Indeed, unexplained attendance declines in SWSD contributed nearly 25% of

SeaWorld's year-over-year attendance decline companywide at the end of March, and
approximately 50% of the company's attendance decline by the end of April.

45.     Although certain senior SeaWorld officials believed the Q1 2014 attendance
decline to be attributable, at least in part, to *Blackfish*, when SeaWorld reported its Q1 2014
results, it omitted the *Blackfish* effect entirely, and instead attributed its weak attendance solely
to factors other than the film, which the Defendants should have known was untrue and/or a
misleading omission of a material fact.

### Atchison Failed to Disclose the *Blackfish* Effect to Underwriters of the April 9, 2014 Secondary Offering

46.     Atchison failed to disclose information about the *Blackfish* effect from
underwriters of the April 9, 2014 secondary offering.

47.     In connection with the April 2014 secondary offering, two underwriters took the
lead on conducting due diligence and informing the company on pricing, investor concerns, and
how to respond to such concerns.  The underwriters asked questions about *Blackfish*, including
"how the publicity surrounding any of *Blackfish*, the cancellation of bands . . . or the potential
California legislation has affected the business" as part of their due diligence.

48.     Despite the fact that Atchison should have known that SeaWorld's reputation had
been materially harmed by *Blackfish* before the April 2014 offering—a fact that the underwriters
considered to be important for investors to know because of the link between reputation and
attendance—he did not disclose this information to the underwriters during the due diligence
calls in which he participated.

49.     Similarly, Atchison did not disclose to the underwriters that SeaWorld's business and attendance had been harmed by *Blackfish*.  Instead, Atchison informed SeaWorld's underwriters that *Blackfish* was not adversely impacting SeaWorld's business.

### SeaWorld's Disclosure on August 13, 2014

50.     On August 13, 2014, SeaWorld, for the first time acknowledging that negative publicity connected with *Blackfish* was impacting attendance, stated in a Form 8-K filing that attendance in Q2 2014 "was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California."  Although the disclosure did not refer to *Blackfish* by name, it was understood internally, and by the press, analysts, and investors, that SeaWorld had finally disclosed that *Blackfish* was negatively affecting its business and that the *Blackfish* effect—even if not quantifiably material on a companywide basis at that point— was qualitatively material to investors.

51.     Following the Form 8-K filing, in which the company also included a downward revision of its earnings guidance for the year, SeaWorld's stock price fell from $28.15 to $18.90—a 33% drop—thereby decreasing SeaWorld's market capitalization by approximately $830 million.  The announcement also widely caused analysts to downgrade SeaWorld's stock to a sell recommendation.

### FIRST CLAIM FOR RELIEF

**Section 17(a)(3) of the Securities Act**
**[15 U.S.C. Sec. 77q(a)(3)]**
**(Against Both Defendants)**

52.     The SEC realleges and incorporates by reference paragraphs 1 through 51, as though fully set forth herein.

14

53.     SeaWorld and Atchison, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting negligently, employed a device, scheme, or artifice to defraud or to engaged in a transaction, practice, or course of business that operated or would operate as a fraud or deceit upon the purchaser.

54.     By virtue of the foregoing, SeaWorld and Atchison, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(3) of the Securities Act.

## SECOND CLAIM FOR RELIEF

### Section 17(a)(2) of the Securities Act
### [15 U.S.C. Sec. 77q(a)(2)]
### (Against Atchison)

55.     The SEC realleges and incorporates by reference paragraphs 1 through 51, as though fully set forth herein.

56.     Atchison, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting negligently, obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     By virtue of the foregoing, Atchison, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of the Securities Act.

## THIRD CLAIM FOR RELIEF

**Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and
13a-1, 13a-11, and 13a-13
[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20 and 240.13a-1; 13a-11; and 13a-13]
(Against SeaWorld)**

58.     The SEC realleges and incorporates by reference paragraphs 1 through 51, as

though fully set forth herein.

59.     SeaWorld, which is an issuer of securities registered pursuant to Section 12 of the

Exchange Act, filed reports with the SEC that made untrue statements of material fact or omitted

to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

60.     By reason of the foregoing, SeaWorld violated and, unless restrained and

enjoined, will again violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11,

and 13a-13 thereunder.

## FOURTH CLAIM FOR RELIEF

**Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for
SeaWorld's Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1,
13a-11, and 13a-13
[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20 and 240.13a-1; 13a-11; and 13a-13]
(Against Atchison)**

61.     The SEC realleges and incorporates by reference paragraphs 1 through 51, as

though fully set forth herein.

62.     Atchison, as president, CEO, and a director of SeaWorld, exercised control over

the management, general operations, and polices of SeaWorld, as well as the specific activities

upon which SeaWorld's violations are based.

16

63.     By reason of the foregoing, Atchison is liable as a control person under Section 20(a) of the Exchange Act for SeaWorld's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, and, unless restrained and enjoined, will again as a control person violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## **RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

### **I.**

Find that each of the Defendants committed the violations alleged in this Complaint;

### **II.**

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint

### **III.**

Order that Defendant Atchison disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint;

### **IV.**

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)], in an amount to be determined by the Court, plus post-judgment interest;

## V.

Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

## VI.

Grant such other relief as this Court may deem just or appropriate.

## <u>JURY DEMAND</u>

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 18th day of September, 2018.

> */s/ Stephen C. McKenna*
> Stephen C. McKenna
> (*Pro Hac Vice Application pending*)
> Attorney for Plaintiff
> UNITED STATES SECURITIES AND
> EXCHANGE COMMISSION
> 1961 Stout Street, 17th Floor
> Denver, Colorado 80294
> (303) 844-1000
> mckennas@sec.gov